# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

MARJORIE KLAPPER

**Case No.  1:19-CR-10117-8**

**Redacted with Leave of Court on October 11, 2019**

## DEFENDANT MARJORIE KLAPPER'S
## MEMORANDUM IN AID OF SENTENCING

NOW COMES Defendant Marjorie Klapper ("Mrs. Klapper"), by and through

undersigned counsel, and respectfully submits the instant Memorandum in Aid of Sentencing.

For the reasons argued below, Mrs. Klapper respectfully recommends a sentence of time-served,[1]

followed by one year of supervised release conditioned on four months' home confinement, 300

hours of community service, a fine of $20,000, and no restitution.

---

[1] Mrs. Klapper should receive one-day credit for the day of her arrest and processing by the U.S. Marshal's Service. *See* 18 U.S.C. § 3585(b)(1) ("A defendant shall be given credit toward the service of a term of imprisonment for any time [s]he has spent in official detention prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed."). Mrs. Klapper was arrested on March 12, 2019 and, after processing by the U.S. Marshal's Service, was subsequently released on $250,000 unsecured bond. PSR at 2.  Per U.S. Bureau of Prisons Program Statement 5880.28 at 1-15A, "[i]f the defendant is released on bail or on 'own personal recognizance' then that day [of arrest and processing] is treated as a day in official detention and shall be awarded as a day of prior custody time credit." *See, e.g., United States v. Cesan*, 18-cr-10383-DPW (D. Mass.) ((PSR guidelines range: 12 to 18 months; sentence: time served—one day; one-year supervised release) (Doc. Nos. 36, 43)); *United States v. Chin*, 18-cr-10384-RGS (D. Mass.) ((PSR guidelines range: 6 to 12 months; sentence: time served—one day, one-year supervised release including three months home detention) (Doc. Nos. 14, 21)); *United States v. Herman*, 18-cr-10326-RWZ (D. Mass.) ((guidelines range (as calculated by Court): 6 to 12 months; sentence: time served—one day, one-year supervised release, including three months' home detention) (Doc. Nos. 36, 41); *United States v. McAuliffe*, 19-cr-10056-DJC (D. Mass.) (guidelines range, as calculated by Court: 6 to 12 months; sentence: time served—one day, one-year supervised release) (Doc. Nos. 35, 38); *United States v. Wilson*, 19-CR-10290 (RGS) (D. Mass.) ((PSR guidelines range: 10 to 16 months; sentence: time served—one day, two-years supervised release, including six months' home detention) (Doc. Nos. 59, 62).

## I.    CHARACTERISTICS AND BACKGROUND OF MRS. KLAPPER

Mrs. Klapper promptly accepted responsibility and pled guilty, but she is not just another defendant in this "Varsity Blues" case.  Her financial circumstances are comfortable but are nothing like those of the celebrities and business magnates who were also charged.[2]  Conspiring to commit a fraudulent act is about state of mind, and the context of Mrs. Klapper's decision-making process is particular to her and substantially mitigating.   When sentenced, Mrs. Klapper must be looked at as an individual, and as explained in more detail below, she was confronting a tragic loss in her family and a horrific physical assault on her epileptic son by multiple assailants after he had recently experienced a *grand mal* seizure.  In addition to the U.S. Sentencing Guidelines advising a sentence of probation for a defendant such as Mrs. Klapper, the case law and her mitigating factors militate against the need for incarceration.

Mrs. Klapper made a modest income by selling jewelry.  She regularly engaged in charitable causes in her spare time, and as reflected in **Exhibit 2** attached hereto, friends and family remain supportive and have provided letters so the Court can have a more nuanced understanding of how Mrs. Klapper is perceived by others.

In committing the instant offense, Mrs. Klapper was neither seeking to use her son to improve her personal status in the eyes of the public, nor to elevate herself among friends and colleagues.  She did not engage in this offense so that her son—who has a legitimate and documented learning disability and medical condition—could enroll in a top-tier university as some "trophy" child.  Mrs. Klapper was not blithely seeking to obtain yet one more advantage for a child who ostensibly already lived a carefree and abundant life.  That was not her motive as that was not his life.  *See* **Exhibit 3** ███████████████████.  Rather, Mrs. Klapper was

---

[2] Attached at **Exhibit 1** is a Google Maps printout of the front of Mrs. Klapper's residence.

motivated by her son's legitimate and documented disadvantages that were exacerbated by a recent, violent assault.  Mrs. Klapper saw her son struggle, and she wanted him to feel like a "regular" student.

Mrs. Klapper's motives were maternal but her execution misguided and illegal.  Beyond question, Mrs. Klapper allowed her zeal to over-reach, for which she profoundly regrets and takes full responsibility.  Her mother, ███████ gives perhaps the most informative perspective possible of Mrs. Klapper in context to the offense conduct in her letter to the Court. *See* **Exhibit 4.**

## II.      CONTEXT TO THE OFFENSE CONDUCT

Like all defendants arrested on federal felony charges—from first time non-violent offenders to recidivist sexual predators—Mrs. Klapper was required to endure the shock and humiliation of being taken into custody by armed federal agents.  This may be part of the reality of committing a federal crime; however, the experience is not lost on her.   At 5 a.m. on Tuesday, March 12, 2019, Mrs. Klapper and her family were awoken by screaming agents banging on their front door shouting her name.  While her children watched in horror amid the chaos, she was handcuffed in her pajamas as agents shouted commands and questions at her.[3]  Allowed a momentary respite to change her clothes, Mrs. Klapper was then transported to a federal building in San Francisco aware only that she had been charged with some sort of mail fraud.  Once at the federal building, still bewildered by all that was transpiring, she was photographed and fingerprinted and then placed in a small holding cell for hours with other frightened parents until released on bond later that day.  Unlike the vast majority of federal defendants, however, she was

---

[3] Obviously, as this Court recognized during the sentencing of Felicity Huffman, the necessity of all this trauma is questionable where, as here, Mrs. Klapper would readily have turned herself in.  *See* Transcript of Huffman Sentencing at 36:4-9 (Doc. 474).

then met by an onslaught of reporters at her home coupled with endless calls and emails, which have not stopped.

    This was just the beginning of the massive, international public shaming she has endured and will continue to endure as a result of her offense conduct.  The many letters submitted in support of Mrs. Klapper document the extent of the harassment and how it even has extended to her children.  Mrs. Klapper accepts responsibility for this and understands that this is part and parcel of her continuing punishment.

    Mrs. Klapper is providing the below timeline of certain milestone events that provide context about the experiences that impacted her decision-making process leading up to—and occurring contemporaneously with—her offense conduct, not all of which have been included in the PSR:

| Date | Event |
|---|---|
| May/June 2006 | ▮ diagnosed with epilepsy after suffering a second seizure. |
| March 17, 2008 | Mrs. Klapper's brother passes away from committing suicide. |
| May 2008 | ▮ diagnosed with ADHD by Dr. Damon Korb. *See* **Exhibit 5**. |
| August 2014 | Mrs. Klapper first hires Singer for tutoring assistance for ▮ upon recommendation from friends in the community. |
| March 2016 | Mrs. Klapper's sister diagnosed with metastatic melanoma. |
| August 2016 | Singer begins providing consulting services for ▮ |
| September 28, 2016 | Letter from Dr. Damon Korb confirming ▮ ADHD and noting his need for |

| Date | Event |
|---|---|
|  | extra time and private setting during all standardized testing.  *See* **Exhibit** 5. |
| Oct. 26, 2016 | Initial accommodation approval from ACT. |
| January 2017 | Mrs. Klapper's sister undergoes second surgery to remove brain tumors. |
| Spring 2017 | ██████████████████████ |
| March 2017 | ██████████████████ |
| March 1, 2017 | Singer solicits "donation" from Mrs. Klapper ██████ can take ACT in Los Angeles. |
| March 15, 2017 | ██████████████████ |
| April 21, 2017 | Mrs. Klapper calls College Board to discuss process for accommodation change request. |
| June 2017 | ██████████████████ |
| July 21, 2017 | Mrs. Klapper's sister passes away. |
| Oct. 28, 2017 | ██████ takes exam in Los Angeles. |
| Nov. 2 and 3, 2017 | Mrs. Klapper sends $15,000 to KWF in two installments |
| Nov. 20, 2017 | ██████████████████ |
| Sept. 2018 | Singer begins cooperating with federal authorities.  Singer also begins working on ██████ college applications. |
| Oct. 22, 2018 | ████████████████████████ |
| Oct. 23, 2018 | ██████████████ <br><br> Mikaela Sanford (Singer's associate) begins sending requests for application confirmation to Mrs. Klapper. |
| Oct. 24, 2018 | Singer calls Mrs. Klapper at direction of federal authorities. |

As Mrs. Klapper's mother explains at **Exhibit 4** attached hereto:

> Margie has suffered a tremendous amount of pain in the past ten years. . . . We have lost two out of three of our precious children—our son to suicide at age 41, and our daughter to metastatic melanoma at age 53. A nephew close to Margie, involved in the family business lost his life to a biking accident. In addition, her father with whom she is very close, has recently been diagnosed with a life threatening heart condition…

> [Margie's] willingness to go along with [Singer's] suggestions came from the love she has for her son, and the same desire she always had to provide better circumstances for someone who needs a less anxiety provoking atmosphere in which to concentrate while taking tests. She certainly was not trying to have him accepted at any particular prestigious university.

## III.   UNRESOLVED OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

¶¶ 18-23:      Mrs. Klapper asks that these paragraphs be deleted as they are not relevant to her particular offense conduct for sentencing purposes and otherwise may wrongly imply that she was associated with this particular offense conduct. *See United States v. Berzon*, 941 F.2d 8, 18 (1st Cir. 1991) ("it well settled that a defendant has a due process right to be sentenced upon information which is not false or materially incorrect;" "disclosure of the presentence report to the defendant and an opportunity for the defendant to contest the accuracy of it -- embodies the congressional intent to assure a defendant's due process rights in the sentencing process;" "a sentencing court must assure itself that the information upon which it relies when fixing sentence is reliable and *accurate*") (internal quotation marks and citations omitted for ease of reading; emphasis added).

¶¶ 30-33:      Mrs. Klapper asks that these paragraphs also be deleted as they are not relevant to her offense conduct for sentencing purposes and otherwise may wrongly imply that she was associated with this particular offense conduct. *See Berzon*, 941 F.2d at 18.

¶ 43:   Mrs. Klapper requests that this paragraph be amended to read as follows: "On a telephone call with Klapper on or about October 24, 2018 ███████████████████ ███████████████ Singer, acting at the direction of law enforcement agents, told Klapper that his foundation was being audited. The following is an excerpt from the call, which was consensually recorded."

¶ 45:   Mrs. Klapper did not originate the erroneous racial and ethnic claims in any applications.  Upon information and belief, Mrs. Klapper believes co-defendant Rick Singer or one of his associates made these changes by accessing the Common Application via the internet. She previously had given him and Mikaela Sanford all user-names and passwords allowing them to access the system at any time.  Sanford in fact created ████████ Common Application account.  *See, e.g.*, **Exhibit 7** (email from Sanford ██████.  Furthermore, not all applications listed ████████ being Mexican or African American.  While the San Diego State application did note that ████████ was both Mexican and African American, the University of Oregon application listed him as Jewish.  Mrs. Klapper did not ever discuss her income or her husband's income with Singer, and never directed Singer to indicate the Klappers had no college education.

¶ 46:   Mrs. Klapper objects to any suggestion that ████████████████ cheated on the SAT exam.  There is no affirmative evidence of this and the ETS letter alleging anomalies hardly amounts to any proof of actual cheating, let alone that Mrs. Klapper had any involvement whatsoever.  Indeed, ETS has been subject to high-profile litigation by students regarding holding back scores on precisely these grounds.  *See, e.g.*, Scott Jaschick, "Student Challenges College Board's Approach to Cancelling Scores," Inside Higher Ed. (Jan. 7, 2019) available at https://www.insidehighered.com/admissions/article/2019/01/07/student-challenges-colleges-boards-approach-canceling-scores.  In all events ████████ did not cheat on the exam and Mrs.

Klapper neither counseled nor encouraged any such conduct.  *See* **Exhibit 8** ████████

████████  Furthermore, the tutoring sessions set forth in the invoice sent to ETS are corroborated

by contemporaneous email correspondence between Mrs. Klapper and the tutor regarding

scheduling various sessions.  *See* **Exhibit 9** (comparison of tutoring sessions to email

correspondence).

### IV.    A NON-CUSTODIAL SENTENCE IS SUFFICIENT, PROMOTES UNIFORMITY AND IS ENCOURAGED BY THE U.S. SENTENCING COMMISSION

"[T]he purpose of the Sentencing Guidelines [is] to provide a framework . . . to guide the

exercise of the court's discretion, which promotes uniformity and fairness in sentencing." *United*

*States v. Gordon*, 852 F.3d 126, 132 (1st Cir. 2017) (internal quotation marks and citations

omitted); USSG Ch.1, Pt.A(3), intro. comment. ("Congress established the [U.S. Sentencing]

Commission to reduce [wide disparity]"); 28 U.S.C. § 994(f) ("The Commission, in

promulgating guidelines . . . shall . . . [give] particular attention to . . . providing certainty and

fairness in sentencing and reducing unwarranted sentence disparities.").  Likewise, when

imposing sentences, courts are directed to consider "the need to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar

conduct." 18 U.S.C. § 3553(a)(6).

### A.    *The Sentences Cited by the Government are Wholly Distinguishable*

In its Consolidated Sentencing Memorandum (Doc. 423), the Government cites to several

cases in support of the contention that "Defendants who perpetrate frauds comparable to this one,

including cheating on tests and misrepresenting academic records, are routinely sentenced to

terms of incarceration." *Id.* at 10.  The Government reports neither the Total Offense Level nor

the Criminal History Category applicable in any of the cases cited.  None of these cases are remotely comparable, and many are wholly irrelevant.

First, considerations of disparity are limited to *federal* cases on a nationwide basis. Accordingly, the Government's citation to anecdotal *state* sentences should be disregarded by this Court.  As the First Circuit has observed, "[o]ur main concern with disproportionate sentences is with disparities between the defendant's sentence and sentences imposed nationally on defendants in the same circumstances." *United States v. Cirilo-Munoz*, 504 F.3d 106, 142 (1st Cir. 2007) (citation omitted); *United States v. Begin*, 696 F.3d 405, 412 (3d Cir. 2012) ("Section 3553(a)(6) addresses unwarranted sentence disparities among federal defendants who are similarly situated instead of disparate federal and state sentences.") (Quoting *United States v. Docampo*, 573 F.3d 1091, 1102 (11th Cir. 2009)); *United States v. Clark*, 434 F.3d 684, 687 (4th Cir. 2006) ("The sole concern of section 3553(a)(6) is with sentencing disparities among federal defendants." (emphasis omitted)); *United States v. Branson*, 463 F.3d 1110, 1112 (10th Cir. 2006) ("Adjusting federal sentences to conform to those imposed by the states where the offenses occurred would not serve the purposes of § 3553(a)(6)."); *United States v. Jeremiah*, 446 F.3d 805, 808 (8th Cir. 2006) ("Unwarranted sentencing disparities among federal defendants remains the only consideration under § 3553(a)(6)—both before and after *Booker*."). "This is so because the purpose of § 3553(a)(6) is to promote national uniformity in the sentences imposed by federal courts." *Begin*, 696 F.3d 405 at 412 (citation omitted).  Indeed, consideration of state sentences when imposing a federal sentence "may decrease one sentencing disparity but simultaneously enlarges another: that between the federal convict and all similarly situated federal convicts . . . [b]ecause penalties vary from state to state." *United States v. Wurzinger*, 467 F.3d 649, 654 (7th Cir. 2006) (citation omitted). In other words, "[a]djusting

9

federal sentences to conform to those imposed by the states where the offenses occurred would not serve the purposes of § 3553(a)(6), but, rather, would create disparities within the federal system, which is what § 3553(a)(6) is designed to discourage." *Branson*, 463 F.3d at 1112.

Second, citation to pre-*United States v. Booker*, 543 U.S. 220 (2005) cases also are irrelevant inasmuch as the Guidelines no longer are mandatory. Accordingly, this Court should disregard the Government's citation to *United States v. Brazil*, CR-02-00882 (C.D. Cal.).[4]

Finally, the remaining post-*Booker* federal cases are all wholly distinguishable and are not otherwise remotely similar to Mrs. Klapper's case, as ably recounted by co-defendant Huffman on pages two through eight of her Reply to Government's Consolidated Sentencing Memorandum (Doc. 438). The table below summarizes these cases.[5] All but one had a higher Total Offense Level—often substantially higher—than Mrs. Klapper.

| Def. Name | Dist. | Dkt No. | USSCIDN | Mode | Off. Lvl. | CHC | Sent. | Restit. | Comments |
|---|---|---|---|---|---|---|---|---|---|
| Barrington | N.D. Fla. | 4:08-cr-00050 | 1277289 | Trial | 25 | I | 84 | | Includes 24-month consecutive sentence |
| Garcia | W.D. Tex | 3:11-cr-01830; 3:12cr1362 | 2083647 | Plea | 38 | I | 42 | $180,000 | Rule 11(c)(1)(C) plea. Related case had over $1 million loss. |
| Lamber | E.D. Tex. | 1:15cr4 | 2331414 | Plea | 19 | I | 40 | $500,000 | Upward departure. |
| Brauman | D. Kan. | 6:05cr10234 | 1026380 | Trial | 17 | I | 12.03 | $18,986 | Downward variance |
| Elliot | D. Kan. | 6:05cr10233 | 1026392 | Plea | 6 | I | 4 | $0 | Coach. Received abuse of position of trust enhancement. |

---

[4] Nonetheless, it is worth noting that the 41-month sentence imposed there was on a defendant found guilty of 14 counts of mail fraud after trial and who was ordered to pay $716,179 in restitution.

[5] The Total Offense Levels, Criminal History Categories, and Restitution awards were verified by cross-referencing these cases to their entries within the U.S. Sentencing Commission's publicly available datafiles from fiscal years 2006 through and including 2018. The USSCIDN is the unique serial number the Commission applies to each entry. *Krystnak* does not have a USSCIDN yet as that defendant was just sentenced in fiscal year 2019, and the datafile for this fiscal year will not be released for several months.

| Def. Name | Dist. | Dkt No. | USSCIDN | Mode | Off. Lvl. | CHC | Sent. | Restit. | Comments |
|---|---|---|---|---|---|---|---|---|---|
| Cross | D. Kan. | 6:05cr 10232 | 1026405 | Plea | 4 | I | 4 | $0 | Head basketball coach. |
| Lashley | D. Kan. | 6:05cr 10197 | 1026391 | Plea | 22 | I | 0 | $18,986 | 3 years' probation. 5K1.1. |
| Krystynak | S.D. W. Va. | 5:18cr 196 | n/a | Plea | 11 | I | 6 | $13,750 | Downward variance. Fraudulently obtained money by changing grades. |
| Fonge | D. Mass. | 14cr10 194 | 2242264 | Plea | 11 | I | 4 | $34,722 | Split Sentence with additional 4 months' home detention.  Used son to obtain false student loan receipts. |
| Shim | E.D. Va. | 1:13cr 367 | 2153336 | Plea | 12 | I | 3 | $31,653 | |

### B.     The Vast Majority of Identically Situated Offenders Receive No More Than a Nominal Day of Imprisonment

During the sentencing of Felicity Huffman, the government cited to a U.S. Sentencing Commission statistic reporting that in 2018 "there were 2,128 U.S. citizen defendants sentenced who had guidelines in zone A like the defendant. Of those, 26.6 percent received prison. And 1.4 additional percent received prison plus some type of home confinement or halfway house. *So nearly one-third of similarly situated defendants went to jail.*"  Huffman Sent. Trans. at 14:4-10. *See* **Exhibit 10** (extract of transcript; emphasis added).  Attached as **Exhibit 11** is a copy of Table 14 from the Commission's *Sourcebook on Federal Sentencing Statistics* from which the government appears to have derived this statistic.  Notably, the table does not reveal the *length* of any terms of imprisonment for those that received a custodial sentence, nor does the table report the applicable Guideline, the total offense level, criminal history category, or whether the defendants were subject to any mandatory minimum or consecutive terms of imprisonment, or even whether the defendant pleaded guilty or went to trial.

11

According to a review of publicly available Commission sentencing datafiles for fiscal years 2006 through and including 2018, there were 281 individuals *identically* situated to Mrs. Klapper for Guidelines application purposes[6] as calculated by the PSR.[7]  *See* **Exhibit 12** (extract of U.S. Sentencing Commission 2006-2018 datafiles for TOL 5).  Like Mrs. Klapper, these individuals (1) were citizens, (2) pleaded guilty, (3) were sentenced under 2B1.1, (4) had a Total Offense Level of 5 (inclusive of any acceptance of responsibility), (5) had zero criminal history points as well as no prior law enforcement contacts,[8] (6) were not subject to any mandatory minimum or consecutive sentence, and (7) did *not* receive a government-sponsored motion for a downward departure or variance.

Fully 186 (66.2%) received a non-custodial sentence and 64 (22.8%) received exactly *one day*, which means that nearly 90% of ***identically*** situated offenders received no more than a single day of imprisonment.  And as for that "day," being processed by the U.S. Marshal alone counts toward that single day of incarceration.[9]  *See, e.g., United States v. Musgrave*, 761 F.3d 602, 604 (6th Cir. 2014) (noting that "[t]he district court sentenced [the defendant] to one day of imprisonment with credit for the day of processing"); *United States v. Davis*, 537 F.3d 611, 614

---

[6] Of the 281 identified, the sentencing information was missing for three.  The 281 cases identified constitute a reduction from the 322 cases provided to the Probation Office in the course of submitting objections.  *See* PSR at 52.  The difference is that the 281 excluded 41 cases that had *some* prior law enforcement contact even if they otherwise had no criminal history points assigned.

[7] Mrs. Klapper stipulated to a total offense level of 7 in her Plea Agreement.  *See* Plea Agreement at 2 (Doc.320).

[8] According to the Commission's datafiles, the variable "CRIMHIST" had a zero value for these individuals.  According to the Commission's "Variable Codebook for Individual Offenders—Standardized Research Data Documentation for Fiscal Years 1999-2018," the CRIMHIST variable indicates "whether the defendant has **any** criminal history or law enforcement contacts, *including behavior that is not eligible for the application of criminal history points (e.g. arrests)." Id.* at 23 (emphasis as in original) available https://www.ussc.gov/sites/default/files/ pdf/research-and-publications/datafiles/USSC_  Public_  Release_Codebook_FY99_FY18.pdf.  Thus, these individuals are a subset of all those in Criminal History Category I inasmuch as a defendant may have up to a single criminal history point but still remain in Criminal History Category I.

[9] *See infra* note 1.

(6th Cir. 2008) ("the court sentenced Davis to one day in prison for each of the two bank-fraud counts (running concurrently and with credit for the one day served when the U.S. Marshals took him into custody)"); *United States v. Libby*, 495 F. Supp. 2d 49, 52 (D.C. Cir. 2007) (noting the government's position that a "'defendant's processing by the United States Marshal's Service constituted one day of 'official detention'" for purposes of sentencing). Importantly, four defendants received a split sentence of one day imprisonment followed by two to six months' home or community confinement.[10]

Thus, the Government's citation to Table 14 in support of its contention that "nearly one-third of similarly situated defendants went to jail" is quite misleading.[11] In fact, *less than 10%* of those identically situated to Mrs. Klapper served more than a nominal day in prison. Only 15 (5.34%) received four or more months' imprisonment. The figure below provides an accurate illustration of how sentences in Zone A are meted out for those truly similarly situated to Mrs. Klapper.[12]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[10] The four cases receiving a split sentence are identified in **Exhibit 12** as USSCIDNs 1050630, 1196798, 1275565, and 2126693.

[11] Based on the Government's own citation, the total percent of defendants receiving any prison is only 28% (26.6% plus 1.4%). That is far from "nearly one-third," i.e., 33.3%.

[12] The U.S. Sentencing Commission records a year-and-a-day sentence as 12.03 months. Accordingly, the figure represents such sentences as 12.03 months.



As a non-custodial sentence is at the bottom but still *within* the advisory range, it is worth noting that nearly two-thirds (64.4%) of all fraud defendants in this district who received a sentence within their respective advisory ranges also received a sentence at the bottom of the applicable range regardless of total offense level and criminal history category. *See* **Exhibit 13** (Table 29 from Commission's Interactive Sourcebook using datafiles 2006-2017).

Even if this Court were to adopt the Government's Guideline calculation and find that Mrs. Klapper's Total Offense Level was 9, and thus in Zone B rather than Zone A, the vast majority of defendants in that scenario still receive either no imprisonment or no more than a nominal day of imprisonment. *See* **Exhibit 14** (extract of U.S. Sentencing Commission 2006-2018 datafiles for TOL 9). There were 445 such individuals identified that met the same criteria as identified above except that their Total Offense Level was 9 instead of 5. Fully 247 (55.5%)

received a non-custodial sentence and 95 (21.4%) received exactly one day.  Thus, nearly 77% of offenders in this group—four offense levels *higher* than Mrs. Klapper—received a non-custodial sentence or no more than a single, nominal day of imprisonment.  Only 39 (8.8%) received four months or greater.  The figure below illustrates the distribution of sentences for this group of offenders.



**Number of Offenders in Selected Sentencing Ranges**
Citizen, Plea, 2B1.1, TOL=<u>9</u>, No Crim. Hist., No Man. Min., No 5Ks (n=445)

Thus, whether comparing the sentencings of those with a Total Offense Level 5 or 9, the vast majority of those in both groups received either a non-custodial sentence or no more than a nominal day of incarceration.

/ / /

/ / /

/ / /

C. **The Commission Strongly Encourages Non-Custodial Sentences for Nonviolent First Offenders such as Mrs. Klapper**

Section 994(j) of Title 28 of the U.S. Code directs the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence **other than imprisonment** in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." (Emphasis added). Accordingly, Application Note 4 of USSG §5C1.1, directs that "[i]f the defendant is a nonviolent first offender [as here] and the applicable guideline range is in Zone A or B of the Sentencing Table, **the court should consider imposing a sentence other than a sentence of imprisonment**." (Emphasis added). As Amendment 881, which added this Application Note effective November 1, 2018, states in the reason for the amendment:

> This new application note is consistent with the statutory language in 28 U.S.C. § 994(j) regarding the "general appropriateness of imposing a sentence other than imprisonment" for "a first offender who has not been convicted of a crime of violence or an otherwise serious offense" and cites the statutory provision in support. It also is consistent with a recent Commission recidivism study, which demonstrated that **offenders with zero criminal history points have a lower recidivism rate than offenders with one criminal history point**, and that offenders with zero criminal history points and no prior contact with the criminal justice system have an even lower recidivism rate.

USSG App. C. (Amend. 881) (citation omitted; emphasis added).

Mrs. Klapper has *zero* criminal history points, no juvenile adjudications, no adult criminal convictions that have aged out, no other criminal conduct, no pending charges or other arrests. PSR at 18, ¶¶ 65-71. She is a true first offender having "no prior contact with the criminal justice system." Thus, she squarely fits within that class of offenders that both Congress and the Commission have found do not warrant a custodial sentence.

**D.**     *A Split Sentence of Time-Served with Four Months' Home Confinement is a Sufficiently Severe Sanction*

"Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001) (internal quotation marks and citation omitted). "Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking." *Gall v. United States*, 552 U.S. 38, 48 (2007) (citing USSG § 5B1.3). Of course, a defendant on probation also lives under constant threat of revocation. *See* 18 U.S.C. § 3565.

The same, of course, holds true for those on supervised release and even more so for a defendant on home detention. *See United States v. Martin*, 363 F.3d 25, 39 (1st Cir. 2004) (home detention is a more onerous restriction on liberty than straight probation). "[S]upervised release and probation are 'oppressive' punishments that substantially restrict defendant's liberty." *United States v. Kravetz*, 948 F. Supp. 2d 89, 120 (D. Mass. 2013) (quoting *United States v. Ruff*, 535 F.3d 999, 1004 (9th Cir. 2008))

In addition to the months of home confinement followed by many more on supervision, Mrs. Klapper will suffer several significant, mandatory and permanent collateral consequences as a result of her felony conviction including the inability to serve as a juror, the inability to run for elective office, or be employed in a management capacity by a financial institution. *See* **Exhibit 15** (list of California State and Federal collateral consequences of conviction for a crime

of moral turpitude).[13]   She also will be precluded from even volunteering at certain residential care and childcare facilities.  *See id.*  The effect of these consequences has been immediate for Mrs. Klapper no longer can even hold a bank account and her credit card accounts are being cancelled.

### E.      Suggestions for Community Service

In light of the nature and circumstances of this offense, Mrs. Klapper has investigated how she can best be utilized to pay back her debt to society and to serve as an effective deterrent to other parents who may be tempted to engage in such conduct.  Undersigned counsel notes that there are 72 high schools in San Mateo County and San Francisco County, of which 54 are public schools.  As part of any community service ordered by this Court, Mrs. Klapper could be ordered to work with their counseling offices to assist parents with children in need of test-taking accommodations and assist underprivileged students in obtaining free or low-cost tutoring services. Additionally, there are area non-profit organizations that she also could be ordered to work with as part of her community service.  Examples of organization to which Mrs. Klapper could apply to volunteer are The Smart Program: https://thesmartprogram.org/get-involved/volunteer/, and Back on Track: http://www.backontracksf.org/.   If these organizations would not accept Mrs. Klapper, she could perform her community service at an organization approved by the U.S. Probation Department.

### CONCLUSION

Mrs. Klapper has timely pleaded guilty and accepted full responsibility for her conduct, which undoubtedly warrants a sufficiently severe sanction.  There is no evidence, however, that under the specific facts of her case, a non-custodial sentence is insufficiently severe to meet the

---

[13] The table set forth in **Exhibit 15** was obtained from the National Inventory of Collateral Consequences of Conviction at https://niccc.csgjusticecenter.org/.

purposes of sentencing, especially when coupled with the imposition of four months' home

detention, hundreds of hours of community service and a significant fine.  This is so especially

where both Congress and the Commission encourage an alternative to imprisonment.  And this is

to say nothing of the dozens of collateral consequences that follow from a federal felony

conviction, which already have begun taking effect.  A custodial sentence, in contrast, is

unnecessary, would create unwarranted disparity and would violate the principle of parsimony.

Accordingly, for the reasons set forth above and to be addressed at the sentencing

hearing, Mrs. Klapper respectfully urges this Court to impose a sentence of time-served to be

followed by one year of supervised release conditioned on four months' home confinement, 300

hours of community service, a $20,000 fine, and no restitution.

Respectfully submitted,

Dated:  October 11, 2019                    **DEFENDANT MARJORIE KLAPPER**

By her attorneys,

/s/ *Jonathan D. McDougall*
Jonathan D. McDougall, Esquire
*Appearing Pro Hac Vice*
**LAW OFFICE OF JONATHAN D.
MCDOUGALL**
1640 Laurel Street
San Carlos, CA 94070
(650) 594-4200
(650) 594-4205 (fax)
jmcdougall.law@gmail.com

/s/ *Daniel K. Gelb*
Daniel K. Gelb, Esquire
BBO# 659703
**GELB & GELB LLP**
900 Cummings Center, Suite 207-V
Beverly, Massachusetts 01915
Tel.  (617) 345-0010
Fax (617) 345-0009
dgelb@gelbgelb.com

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that on October 11, 2019 this document was electronically filed with the Clerk of Court for the United States District Court for the District of Massachusetts using the CM/ECF system, which will send a notice of electronic filing (NEF) to all registered participants in the above-captioned action.

/s/ *Daniel K. Gelb*

Daniel K. Gelb, Esquire